904 So.2d 440 (2005)
Stavros KONSOULAS, Appellant,
v.
Terri KONSOULAS, Appellee.
Nos. 4D03-2678, 4D03-4604.
District Court of Appeal of Florida, Fourth District.
March 9, 2005.
Rehearing Denied July 7, 2005.
*442 Nancy Little Hoffmann of Nancy Little Hoffmann, P.A., Pompano Beach, and William L. Gardiner, III of Conrad & Scherer, LLP, Fort Lauderdale, for appellant.
Mitchell W. Mandler of Becker & Poliakoff, P.A., Coral Gables, for appellee.
STONE, J.
Stavros Konsoulas appeals a final judgment of dissolution as to awards of alimony, child support, life insurance, equitable distribution, and a post-judgment attorney's fee order. We reverse as to all.
The parties were married in 1988 and have three children. At the time of the marriage, Stavros was working at the family-owned gas station (Southport), in which he was given a 16% interest by his father, Nick Konsoulas, in 1985. Terri Konsoulas was a legal secretary, but ceased working when the couple's first child was born. She helped out at the gas station once the children were in school.
In 1995, Stavros and his brother, Tolli, who also held a 16% interest in Southport, borrowed $78,000 from Southport to purchase a second gas station. Stavros, Terri, Tolli, and his wife, also guaranteed a $100,000 bank loan to purchase the business. Eventually, the brothers executed a stock swap, in which Tolli received Stavros' 50% interest in their station and Stavros received Tolli's 16% interest in Southport. As part of the swap, Southport paid off the $100,000 loan and Stavros became responsible for repaying the $100,000 to Southport as well as the initial $78,000 advance. Stavros ultimately signed a $178,000 promissory note to Southport in 2002.
By 2000 and 2001, Nick began spending extensive time in Greece while Stavros assumed greater responsibility for the daily operations of Southport. In that capacity, Stavros had some control over the salary and distributions given to shareholders. Stavros then began taking additional money out of Southport's account in addition to his $48,000 salary. Stavros took over $80,000 in additional distributions in 2000 and took over $93,000 in distributions in 2001. In August 2001, Terri instituted this action.
In May 2001, Southport refinanced the gas station and, in the process, satisfied Stavros and Terri's home mortgage (in addition to Nick's home mortgage). Stavros contends that he and Terri were then obligated to make mortgage payments to Southport; however, before any mortgage arrangement was reduced to writing, the parties' marriage disintegrated. Terri contends that she and Stavros were not expected to repay Southport.
In February 2001, Southport hired a new accountant to straighten out the company's books. The accountant discussed his findings with Stavros and Stavros stopped taking the additional draws. When Nick learned of the excess draws, he reduced Stavros' annual salary to $41,600, plus gas, health insurance, and cell phone. Stavros testified his salary and distributions could not have continued at their previous level in any event, due to increased expenses and the business decline following September 11 that reduced profits. Additionally, Stavros says that he was required to return the 16% ownership share he obtained in the stock swap with Tolli because he would be unable to pay the $178,000 promissory note. That note, however, was not due until 2007.
Terri got a job as an accounts clerk, working 30-35 hours per week and making approximately $1,200 per month. Stavros' vocational expert testified that Terri could return to work as a legal secretary if she took a ten-month course, raising her earning potential from $27,040 to $32,280.
*443 By the time of trial, the parties had depleted all investments. The remaining assets were the marital home, the Southport stock, and household items and jewelry. The marital debts included $11,000 owed to the IRS and $10,000 of outstanding property taxes. The parties stipulated that the value of the marital residence was $323,000.
The value of the Southport stock was disputed. In the final judgment, the court valued Stavros' share of the business at $516,200. The testimony of Terri's expert, adopted in large part by the trial court, included, in the value of the business, the amount owed under the promissory note, but the expert recognized that if the note and mortgage obligations to Southport were not valid, the total value of a 32% share should be reduced accordingly.
The trial court rejected Stavros' testimony, concluding that the reduction of his income below the $110,000 per year he acknowledged in an early affidavit, and the claimed promissory note obligation, were an "artifice." The court awarded the house and 8% of the corporate stock to Terri.
Terri acknowledges that some of the figures used by the court in the equitable distribution award are erroneous and should be adjusted. The court, in adopting the stock valuations of the wife's expert, failed to use the valuation which excluded the promissory note, which the court determined was not intended to be repaid. Terri also acknowledges that after considering the appreciation of Stavros' premarital portion, and adjusting for other errors, the equitable distribution award should be based on a reduced valuation of approximately $456,000.
Additionally, there is inconsistent language in the judgment as to the court's conclusion regarding Stavros' additional 16% interest in Southport, in part indicating that Stavros' share of the business was 16% and in part indicating 32%. The trial court did not make a finding that the additional 16% interest was not turned over to Southport as claimed. If, in fact, Stavros' legal interest reverted to the original 16%, then the figures used in the equitable distribution are further distorted.
The trial court also allocated depleted marital assets in the equitable distribution. Stavros was awarded his depleted retirement plan, and Terri was awarded her depleted IRA. It is an abuse of discretion to award an asset that is valueless. Knecht v. Knecht, 629 So.2d 883, 886 (Fla. 3d DCA 1993); see also Segall v. Segall, 708 So.2d 983, 986 (Fla. 4th DCA 1998); Cooper v. Cooper, 639 So.2d 153, 155 (Fla. 2d DCA 1994). Further, $19,428 had been borrowed against the life insurance policy.
Terri agrees that a corrected equitable distribution plan should delete the depleted retirement plan and IRA and that the loan against the life insurance policy should be taken into account. On remand, the equitable distribution plan must be amended to remove the assets that were valueless as of the valuation date, and the life insurance policy loan should be reflected as a liability.
The judgment also did not include the parties' IRS (marital) debt and erroneously reflects that Terri would be responsible for all real estate taxes due, when it was agreed that the taxes were to be divided. Further, the figures adopted by the trial court include all of Terri's post-filing liabilities, but not Stavros' equivalent liabilities.
It is evident that the trial court intended an equal distribution and that an unequal equitable distribution was also entered by mistake. Equitable distribution should result in an even division of assets *444 unless the trial court makes findings supporting an unequal distribution. Shepard v. Shepard, 584 So.2d 1123, 1124 (Fla. 4th DCA 1991); Weimer v. Weimer, 677 So.2d 86, 88 (Fla. 4th DCA 1996). Here, no findings support an unequal distribution. Terri does not dispute that an equal distribution should have resulted and suggests a reduction in her share of the Southport stock to 4.17% to effect such an outcome.
We also conclude that the trial court abused its discretion by imputing $110,000 annual income to Stavros. Clearly, a court may impute income where a party is willfully earning less and "the party has the capability to earn more by the use of his best efforts." Hayden v. Hayden, 662 So.2d 713, 716 (Fla. 4th DCA 1995); Cushman v. Cushman, 585 So.2d 485, 486 (Fla. 2d DCA 1991). Although the trial court is free to determine the credibility of witnesses, restraints on imputation exist in the form of a required two-step analysis. First, the trial court must conclude that the termination of income was voluntary; second, the court must determine whether any subsequent underemployment "resulted from the spouse's pursuit of his own interests or through less than diligent and bona fide efforts to find employment paying income at a level equal to or better than that formerly received." Ensley v. Ensley, 578 So.2d 497 (Fla. 5th DCA 1991). In any event, the trial court may only impute a level of income supported by the evidence of employment potential and probable earnings based on history, qualifications, and prevailing wages. Connell v. Connell, 718 So.2d 842, 843 (Fla. 2d DCA 1998).
We recognize that the trial court may consider a party's attempt to arrange his other finances to avoid paying a spouse alimony or child support. Bronson v. Bronson, 793 So.2d 1109, 1111 (Fla. 4th DCA 2001). Where a party voluntarily reduces income under these circumstances, income may be imputed, provided the imputation is supported by the evidence and findings concerning probable earnings. Alon v. Alon, 665 So.2d 1110, 1111 (Fla. 4th DCA 1996).
Here, however, despite the court's skepticism, it is undisputed that the majority shareholder will no longer permit the excessive draws from Southport. A party cannot be expected to act illegally to maximize income. See Abbott v. Abbott, 832 So.2d 964, 966 (Fla. 2d DCA 2002). Stavros cannot be expected to raid the corporate till, and the record reflects that his salary is not out of line with his position or other employment prospects.
Finally, the standard of living enjoyed by the parties to the marriage cannot necessarily be maintained where the parties lived beyond their means, and the former husband can no longer financially support the standard of living. See Sheiman v. Sheiman, 472 So.2d 521, 521-22 (Fla. 4th DCA 1985). There was no evidence that Stavros could earn more than $48,000 yearly as a gas station manager or that the business is withholding net profits that would be available for draws.
Understandably, the trial court viewed the change in income as suspicious or artificial. Stavros is unquestionably more than a typical gas station manager, as he is a minority shareholder of the company and an active participant in corporate management. Nevertheless, it is undisputed that his father is the majority shareholder, and the record reflects that Stavros will no longer receive the bonus distributions because his father has ultimate control over company financial decisions. We emphasize that there is no evidence of any corporate profits available for distribution that are being withheld or sheltered for Stavros' benefit.
*445 Therefore, we reverse as to the alimony award and remand for reconsideration because of the necessary re-evaluation of Stavros' income and the equitable distribution award.[1]
It is also an abuse of discretion to require Stavros to obtain a life insurance policy ("in an amount that will secure the awards of child support and alimony") in the absence of a demonstrated need or any evidence regarding the availability and cost of such insurance. See Smith v. Smith, 811 So.2d 840, 840 (Fla. 4th DCA 2002); Hedendal v. Hedendal, 695 So.2d 391, 392 (Fla. 4th DCA 1997).
The award of fees and costs is also reversed due to our resolution of the other issues on appeal.
We remand for modification of the final judgment accordingly and for such further proceedings as may be necessary to implement this opinion.
WARNER, J. and BRYAN, BEN L., Associate Judge, concur.
NOTES
[1] We also note that the length of this marriage places it in a "gray area" and that, although the petition did seek permanent alimony, Terri did not argue for permanent alimony at trial, asking only for seven years rehabilitative alimony.